CLARA C. ROBINSON *v.* JOHN D. HOSPELHORN,
RECEIVER.
PHILIP L. POE. *v.* SAME.
WILMER F. SMITH *v.* SAME.
ROBERT C. WATERS *v.* SAME.
MARY WASHINGTON THOM ET AL., EXECUTRICES,
*v.* SAME
SAFE DEPOSIT & TRUST COMPANY *v.* SAME
[Nos. 46-51, April Term, 1935.]

118

Decided June 18th, 1935.

The causes were argued before URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*Simon E. Sobeloff,* with whom were *William L. All, W. Conwell Smith* and *Wm. Taft Feldman,* on the brief, for Clara C. Robinson and Philip L. Poe, appellants.

*D. K. Este Fisher,* for Wilmer F. Smith and Robert C. Waters, appellants.

*Chester F. Morrow,* with whom were *H. Warren Buckler, Jr.,* and *Niles, Barton, Morrow & Yost,* on the brief, for Mary Washington Thom and Mary Gordon Thom, Executrices, appellants.

*Charles G. Page,* for the Safe Deposit & Trust Company, appellant.

*Joseph C. France* and *Alexander Armstrong,* with whom was *J. Purdon Wright* on the brief, for John D. Hospelhorn, Receiver, appellee.

OFFUTT, J., delivered the opinion of the Court.

The Baltimore Trust Company, a Maryland corporation carrying on a state banking and trust business at Baltimore City, upon the passage of chapter 46 of

Acts of 1933 came under the custody, management, and control of the Bank Commissioner of Maryland, and was not discharged from that custody until the appointment of a receiver in this case. On January 5th, 1935, the Bank Commissioner, who by virtue of the authority of Code, art. 11, sec. 9, and art. 11, sec. 71F (Acts 1933, ch. 46, sec. 1), was authorized to take possession of its property and business until it should resume business or its affairs be finally liquidated, posted on its front door a notice that it was "in the hands of the Bank Commissioner." On the same day he filed the bill of complaint in this case, reciting those facts and praying the appointment of John D. Hospelhorn, Deputy Bank Commissioner, as received for the institution. An answer consenting to the relief prayed was filed by the Baltimore Trust Company and by an order of that date Hospelhorn was appointed receiver as prayed with the usual powers of such an officer.

On the same day Hospelhorn, receiver, filed a report and petition in which he stated:

"That (as Deputy Commissioner) your receiver has been familiar with the affairs of the Trust Company since it came into the custody of the Bank Commissioner by virtue of said Act of 1933; and after careful study and consideration, he is satisfied that the remaining assets (being substantially those held for realization and liquidation by the Baltimore Trust Corporation) will be grossly insufficient to pay the balance of the indebtedness. That is to say:

" (a) The balance so due depositors and other creditors (not including claims in dispute or unliquidated) is approximately nineteen million eight hundred and twenty thousand ($19,820,000) dollars; and in addition to this, is the sum of seven million, seven hundred thousand, four hundred ($7,700,400) dollars, represented by the Guaranty Fund Certificates. This guaranty fund was raised for the Trust Company on or about September 21st, 1931; and the contributors (while by an Agreement of September 19th, 1931, they were subordinated to depositors and

other creditors) are (your receiver is advised) entitled to recourse to the said statutory liability.

"(b) While some of the assets so in process of liquidation and realization are difficult of present appraisal, the amount for distribution after full liquidation of the loan of the Reconstruction Finance Corporation, which is a lien on practically all assets (in the judgment of your receiver, supplemented by the best information now available to him) will not (in addition to the full statutory liability) be sufficient to pay the remaining liabilities."

Upon those allegations he prayed authority to enforce the statutory double liability against the stockholders of the trust company.

Interpolated in the record, but having no apparent connection with it, is the following unauthenticated statement purporting to show the bank's condition at the close of business on January 5th, 1935:

Assets

| | |
|---|---|
| Loans—Collateral | $ 569,316.74 |
| Investments | 35,503,299.25 |
| Total | $36,072,615.99 |

Liabilities

| | |
|---|---|
| Capital | $ 6,250,000.00 |
| Surplus | 3,000,000.00 |
| Undivided Profits | * 1,267,600.57 |
| Baltimore Trust—Guaranty Fund | 7,700,400.00 |
| Liability a/c Outstanding Loan Participations | 569,316.74 |
| Balance due on Cert. of Ind. | 19,613,006.23 |
| Balance due on Restricted Balances | 207,493.59 |
| Total | $36,072,615.99 |

*Deficit.

Other Liabilities of Baltimore Trust Company Assumed by Baltimore Trust Corporation

| | |
|---|---|
| Reserve for Distribution | $ 24,532.96 |
| Bills Payable | 7,739,016.10 |
| Outstanding Checks | 106,014.92 |
| | $7,869,563.98 |

Upon that report and petition it was ordered that the receiver demand and collect from the stockholders of the Baltimore Trust Company or, they being dead or insolvent, from their estates, "ten dollars per share," that being the par value of the stock, and the greatest possible extent of their statutory liability; but it was also provided that the order might be vacated upon cause shown on or before February 25th, 1935, after notice which by its terms the receiver was directed to give to the stockholders.

The notice was given, and many stockholders, severally and in various forms, denied the right of the court to impose the assessment made in the order, and on March 20th, 1935, the court, acting under Code, art. 16, sec. 220, directed that the following questions of law be raised for the opinion of the court and settled "preliminarily":

"Whether by the true construction of the plan of reorganization and its amendments adopted pursuant to the Emergency Banking Act ('Chapter 46 of the Acts of 1933) and the assent thereto by creditors and their acceptance of Certificates of Indebtedness provided by the plan, and the assent of stockholders, and the subsequent proceedings under said plan, including the formation of the Baltimore Trust Corporation and the transfer to it of the assets of the Baltimore Trust Company and the assent to such transfer by the holders of the Certificates of Indebtedness,—

"I. There is any liability upon the stockholders, or any of them, for any assessment assuming an insufficiency of assets to pay depositors and other creditors.

"II. Such an assessment can properly be made before the maturity of the certificates of Indebtedness—

"(a) if it is assumed that the deficit in the present value of the assets is such as to exceed 100% of the stockholders' liability and that the deficit will remain such until July 1, 1938?

"(b) if it is assumed that the deficit in the present value of the assets is such as to exceed 100% of the stock-

holders' liability, but that by reason of the nature of the assets and a change in business conditions, there will be such an appreciation in the value of the assets by July 1, 1938, as would substantially reduce the amount of the required assessment, or entirely overcome the need for the same?

"It is intended that all other questions, including the question of insolvency, *vel non,* and the extent thereof, the status of subscribers to the guaranty fund, and the question as to the liability of particular stockholders for debts created before they became such, or after the bank passed into the control of the Bank Commissioner, and all other relevant questions are reserved for the future determination of the court, as being unnecessary for present decision."

It further provided that the hearing should be upon certain exhibits herein referred to and such relevant testimony as might be offered, and further that any stockholder or the receiver might appeal.

The parties were accordingly heard, and after the hearing the court "adjudged, ordered and decreed that the answer to question I raised by said order is 'Yes'; the answer to question II (a) raised therein is 'Yes' and the answer to question II (b) raised therein is 'No'." These appeals are from that order.

While their approaches differ, the appellants all object to the order on one of two grounds, either that the court has no power to impose the assessment at all, or that it has not the power to impose it at this time. The background of both objections is the same and is to be found in the so called reorganization plan of the Baltimore Trust Company, acts incident thereto and connected therewith, and the banking legislation of this state.

The Baltimore Trust Company, which for convenience will be called the "Old Bank," was one of the early casualties of the depression. It entered into the sanctuary afforded by the Emergency Banking Act in March, 1933, and only emerged from it when the receiver took charge and possession of its business and assets. In the period

intervening between those events, a plan referred to more for convenient reference than as a descriptive term as the "Reorganization Plan" was formulated and effected. Under that plan, a new bank was formed under the title of the "Baltimore National Bank," herein called the "New Bank," and the good will, trust, and safe deposit business of the Old Bank transferred to it, but which had no tangible connection with that bank other than the reservation of certain preferential stock subscription rights to (1) the Old Bank, (2) its creditors, (3) holders of certain guaranty fund certificates issued by the Old Bank, (4) its stockholders, under which members of those classes in that order of priority were privileged to subscribe to the common stock of the New Bank. A liquidating corporation was incorporated as the Baltimore Trust Corporation, referred to herein as the "Liquidating Corporation," to which was assigned all of the Old Bank's property and assets except such rights as it might have to assess against and collect from its stockholders such amounts as might be found to be payable by them under Code, art. 11, sec. 72, commonly known as the "double liability" statute. So that at the end the Old Bank was left as a mere shell, having neither good will, business, nor assets except the liability of its stockholders to pay its debts to the extent of the amount of their stock therein at its par value, and the right to receive and distribute the net proceeds of assets by it transferred to the liquidating corporation.

It was after that assignment and when the Old Bank had reached that condition, that the bill in this case was filed and the receiver appointed. The apparent reason for his appointment and his function when appointed were to enforce that liability against stockholders of the Old Bank, and to receive and distribute the net proceeds of the liquidation of its assets from the liquidating corporation.

The successive steps and stages by which that result was accomplished are all indicated or prescribed in the

reorganization plan, which may now be considered, and which was formulated and proposed by the board of directors of the Old Bank.

The first four articles of the plan have to do with the formation of the New Bank, its organizing personnel, its capitalization, the classification of its stock, and the establishment of certain priorities in respect to stock subscription rights.

Article 5 relates to the distribution of the Old Bank's assets. It provides, (a) for the payment in full of all balances not exceeding ten dollars of restricted deposits, (b) ten per cent. of all other restricted deposits and unsecured claims, except deposits secured by collateral or to which set-offs may apply, contingent, unliquidated, or undisclosed claims, payments to be made directly or by unrestricted deposits in the New Bank (c) for the payment in full of preferred claims upon the establishment of the preference "in accordance with law," for setting up a reserve to cover the balance of all known possible preferences existing at the consummation of the plan, and the application of any balance eventually remaining in said fund to the payment of the Reconstruction Finance Company on account of its loan made under the plan, (d) for the issuance of certificates of indebtedness for balances due to all depositors and unsecured creditors of the Old Bank becoming parties to the plan, except holders of guaranty fund certificates and other creditors for whom special provision is made elsewhere, the certificates to mature on July 1st, 1938, to be assignable but not negotiable, to be subject to acceleration of maturity, and to bear interest at two per cent. per annum on unpaid balances, (e) for dealing with deposits secured by collateral, (f) for dealing with contingent, unliquidated and undisclosed liabilities, (g) for the payment of guaranty fund certificates from any balance remaining after the payment in full of the certificates of indebtedness and the interest to accrue thereon, and other liabilities of the Old Bank to its creditors, together with the pay-

ment of interest at two per cent. per annum on principal balances to holders of the guaranty fund certificates, (h) for the payment of any balance then remaining to the stockholders of the Old Bank, and (i) for the protection and preservation of rights of set off existing in favor of depositors and other creditors of the bank.

Article 6 provides for the negotiation of a loan of $3,-454,000 to the Old Bank by the Reconstruction Finance Company, and by possible implication, for the pledge of the Old Bank's assets to secure the loan, with an allowance for variation in the amount necessary to adjust the claims of dissenters.

Article 7 provides for the segregation of deposits, and under it unrestricted deposits in the Old Bank are to be credited in the same names on the books of the New Bank, except in certain instances where payments to depositors are to be made by check. It further provides for the transfer so far as practicable of the trust and safe deposit business of the Old Bank to the New Bank "on a rental basis" and that the New Bank will assist "in the realization upon the assets of the old bank so far as in the judgment of the new bank such assistance is consistent with the absolute safety and liquidity of the new bank."

Article 8 provides for the creation of an advisory committee of seven persons, of whom four are named to represent creditors and depositors, three to represent subscribers to a guaranty fund, and one to represent the stockholders. This committee has since been superseded by "voting trustees," and its powers, functions, and duties are of historical rather than of present interest, except in so far as reference to it may be needed to determine the powers, functions, and duties of the voting trustees. Its purpose was to aid in carrying out the plan to control and supervise the "conduct and realization of assets of the Old Bank," and it was clothed with the powers incident to the fulfillment of that purpose, and until superseded its membership was largely self-perpetuating.

Article 9 provided for the formation of a "liquidating corporation" to which "all assets" of the bank were to be transferred, the transfer not to "impair any claim which a receiver of the old bank might be able to enforce against any person or persons, including the statutory double liability of the stockholders of the Baltimore Trust Company, for the debts of said Trust Company." All the stock of that corporation was to be issued to the bank and by it transferred to the persons then constituting the advisory committee as "voting trustees," under a voting trust to continue to July 1, 1938, unless sooner terminated by the demand of the holders of a majority in amount of the certificates of indebtedness then outstanding. All net proceeds of the liquidation to be effected by the corporation to be paid to the Old Bank for distribution, it being intended that "as nearly as possible the liquidating corporation shall conduct the realization upon the assets of the Baltimore Trust Company in the same manner as the Baltimore Trust Company would do if the liquidating corporation had not been formed."

Articles 10 and 11 relate to such administrative details as operating expenses, rental of banking quarters, and the like.

Articles 12, 13, and 14 are as follows:

"12. Non-Waiver of Liability. The adoption and consummation of the plan shall not operate to release any liability which a receiver of the old bank might be able to enforce against any person or persons, and it is distinctly understood that the stockholders of The Baltimore Trust Company shall not be released from any statutory double liability for the debts of said Trust Company and that all of the liabilities herein referred to shall remain enforcible for the benefit of those who may dissent from the plan as well as for the benefit of those may become parties to the plan.

"13. Provisions for Persons Not Assenting. The rights of any depositor, creditor, stockholder or other party in interest not approving the plan are governed by the provisions of Section 71-I of Article 11 of the Code of Public

General Laws of Maryland, as enacted by chapter 46 of the Acts of 1933, sometimes known as the Emergency Banking Act, relating to dissenters. Such dissenters will not receive any of the benefits to be derived from the consummation of the proposed plan.

"14. Parties to the Plan. All depositors, creditors, stockholders or other parties in interest not dissenting as provided in said Section 71-I shall be and become parties to the plan as therein and herein provided."

Article 15 provides that the plan shall become operative when the bank's directors so declare, and that the consummation or abandonment of the plan shall be subject to "Section 71-I," presumably of the Emergency Banking Act.

Article 16 provides that minor changes not affecting substantial rights of interested parties may be made by the advisory committee and directors of the bank with the approval of the Bank Commissioner, and that assent to the plan shall be deemed assent to the changes.

Attached to and forming a part of the plan was a statement of the characteristics of the preferred stock to be issued by the New Bank and the relative rights of the holders of the common and preferred stock of that corporation, and also a statement of provisions made for "set-offs."

A form of the certificates of indebtedness to be issued under the plan found in the record conforms to the provisions in the plan for the issuance of such certificates.

The incorporators of the liquidating corporation, incorporated as the Baltimore Trust Corporation, are all members of the creditor group of the advisory committee, and they with the other members of that committee were to be its directors until their successors were duly chosen and qualified.

Its purpose was "to acquire, receive, hold and own assets of whatsoever kind or nature, whether real, personal or mixed property, of the Baltimore Trust Company, and to collect, sell, mortgage, pledge, hypothecate, settle, com-

promise or in any other lawful manner liquidate such assets of the Baltimore Trust Company, all in accordance with and pursuant to the plan of Reorganization of the Baltimore Trust Company approved by the Bank Commissioner of the State of Maryland on the 12th day of June, 1933," and it was given all such powers as would naturally be required to carry out that purpose. Its authorized capital stock was $1,000, which was to be issued to the bank and by it transferred to "the persons" constituting the advisory committee, to be held by them as "voting trustees."

The certificate further states that: "All assets of the corporation are held for the benefit and use of the depositors, creditors, holders of Guaranty Fund Certificates, stockholders or other parties in interest in and of the Baltimore Trust Company pursuant to and in accordance with said Plan of Reorganization, and all net proceeds of the liquidation of the assets of the corporation shall be distributed by the corporation to those entitled thereto as provided in said Plan of Reorganization." It is also provided that no compromise or settlement affecting assets of the corporation of a claim involving more than $1,000 shall be made without the approval of one of several groups or committees alien to the corporation.

An agreement between the Old Bank and the liquidating corporation, a voting trust agreement between the Old Bank and the persons composing the advisory committee, were executed as contemplated by the plan, and all the property and assets of the Old Bank assigned to the liquidating corporation except such rights as might exist to enforce a double liability against stockholders of the Old Bank in favor of its creditors. The plan, the subsidiary agreements, the assignment, and all other steps to which reference has been made, taken for the purpose of executing the plan, were approved by the Bank Commissioner.

It is stipulated that the Old Bank was open for business throughout the banking day of February 24th, 1933,

and that the appellants have filed either answers or demurrers. There also appears in the record a letter not covered by any stipulation, and not certified, in which the bank is supposed to state that it has received approvals of the plan "of $12,988,187.32 representing 9,505 approvals which approvals cover the holders of 10,125 Certificates of Indebtedness of the Baltimore Trust Company."

It is apparent from this statement that while this is a proceeding to enforce the double liability of the bank's stockholders, the immediate purpose of these appeals is to obtain the opinion of the court as to whether such a liability exists if certain issuable facts are proved.

The validity of the plan as *ultra vires* the Old Bank is apparently not challenged, but the question is, assuming that the plan is valid, what effect has it upon the statutory liability of the stockholders of the corporation to pay its debts to the extent of the par value of the stock respectively held by them in it, and if all the creditors of the bank have postponed the maturity of their claims until July, 1938, can the liability of the stockholders, if there is a present deficit, be enforced now?

Assuming therefore that the plan is valid, the question is whether, under the circumstances stated above, its adoption and execution discharged or postponed the liability of stockholders of the Old Bank to pay in addition to their original subscription up to the par value of their stock on account of debts due by the Old Bank.

The appellants contend that the adoption and execution of the plan did either discharge or postpone that liability, and in support of that contention they have submitted reasons which may be thus summarized: They say: (1) That there has been no liquidation of the Old Bank within the meaning of Code, art. 11, secs. 9, 60, art. 23, secs. 92, 94, that the double liability imposed by Code, art. 11, sec. 72, is contingent upon such a liquidation, that that condition was not affected by the emergency banking legislation, Acts 1933, ch. 529, sec. 2 (adding section 9B to Code, art. 11), which contemplated not the liquidation

but the reorganization of banks; (2) that the additional liability imposed by Code, art. 11, sec. 72, is a secondary and not a primary liability, that it does not ripen into a demandable claim until the corporation has defaulted, or is unable to pay its debts, and the existence and extent of the deficit has been judicially ascertained; (3) that since the creditors have agreed that payment of their claims be deferred until 1938, the additional liability imposed upon the stockholders by section 72, *Id.*, will not become consummate or enforceable before 1938, and that until that time arrives, and it then appears that after complete liquidation the assets of the corporation will not suffice to pay its debts, such additional stockholders' liability cannot be enforced; and (4) that the plan so far affected the risk arising out of the liability imposed by the act (Code, art. 11, sec. 72) as to fully discharge them therefrom.

The controlling question in the case, and one by which the force of these objections must be tested, is the nature and extent of the liability imposed by Code, art. 11, sec. 72.

So much of that statute as is material reads as follows: "Stockholders of every bank and trust company shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of every such corporation, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such stock. * * * And the liability of such stockholders shall be an asset of the corporation for the benefit ratably of all the depositors and creditors of any such corporation, if necessary to pay the debts of such corporation, and shall be enforceable only by appropriate proceedings by a receiver, assignee or trustee of such corporation acting under the orders of a court of competent jurisdiction."

The cases in which the nature of such a liability have been considered have necessarily turned upon the language of particular statutes which the courts were called upon to construe. The liability is wholly statutory, its

definition must be found in the words of the statute creating it, and there is no room for the application of general principles, or of precedents except those which deal with this particular statute or with others substantially similar to it, although where its language is ambiguous the ordinary canons of statutory construction may be invoked to aid in its interpretation. *Morse on Banking*, sec. 675. It is in derogation of the common law and its meaning cannot be extended beyond the words used. *Id.*, n. 3, 4; *Brunswick Terminal v. National Bank of Baltimore*, 192 U. S. 386, 24 S. Ct. 314, 48 L. Ed. 491.

Even if the statute had stopped at the words "the liability of such stockholders shall be an asset of the corporation," the liability would not necessarily have been regarded as primary in its nature, but when it went on to say that that "asset" should be for the benefit of the depositors and creditors of the corporation, "if necessary to pay the debts of such corporation," it seems clearly to mean that it is conditional and contingent, and that while it exists as a reserve for the benefit of creditors, it is dormant and unenforceable until it is needed to pay the debts of the corporation. It is therefore, technically, neither a primary nor a secondary liability, but has some of the characteristics of both. It is primary in that it is an original undertaking, and arises by force of the statute out of the stockholders' original subscription. It is secondary in that it may not be enforced until it sufficiently appears that the corporation is unable to pay its debts from its other assets, and then only to the extent of the deficit.

In *Hughes v. Hall*, 117 Md. 547, 552, 83 A. 1023, 1025, the court dealt with a statute which provided that the unpaid balance due on an original stock subscription should be an "asset" of the corporation enforceable in the event of its insolvency at the suit of a receiver or other person winding up a corporation. In respect to that liability it was said: "In section 41, the only subject dealt with is the stockholders' liability, which is declared to be an asset of the corporation in the event of insolvency, and without any mention whether such in-

solvency shall be established by a decree of court, or the proof of it as a fact, and express authority for the enforcement of such liability is conferred upon the receiver, trustee, or other person winding up the affairs of the corporation. But the primary source to look to for the payment of the debts of a corporation is the tangible assets of the corporation, and these should be first exhausted for the benefit of the creditors before recourse is had as against the stockholders." That statute did not have the qualifications found in this, that the liability might only be enforced "when necessary to pay the debts of the corporation," but made such enforceability depend upon insolvency. If the liability in that case was contingent, and it was so held, it cannot well be otherwise in this. There the contingency was insolvency; here it is that the liability is needed to pay debts. Obviously that does not mean any debts at any time or under any circumstances, but to pay debts which could not otherwise be paid at all. What was said in *Hughes v. Hall, supra,* was in accord with what is the nearest approach there is to a general rule affecting the question, and which in *Morse on Banking,* secs. 675, 687, is thus stated: "The constitutional liability of stockholders in a banking corporation was designed solely for the benefit of creditors, and constitutes a fund available only when the bank is insolvent and unable to meet its obligations in full. It amounts for all practical purposes to a reserve or trust fund to be resorted to only in proceedings in liquidation. * * * In ordinary cases, so long as there are assets which have not been divided among the creditors, the shareholders cannot be looked to. A dividend consuming the whole property ought first to be declared, and it will be no excuse for a suit brought before its declaration that it has been postponed indefinitely for the purpose of preventing a sacrifice of the property."

Assuming that the liability is contingent, what is the contingency upon which its enforceability depends? The statute declares that it is an "asset * * * if necessary to pay the debts of such corporation." Code, art. 11, sec.

134 

 

72. In *Hughes v. Hall, supra,* it was held that such an asset is not available to pay the debts of an insolvent corporation until after its tangible assets have been "exhausted," and it gave as one reason for affirming an order sustaining a demurrer to a bill to enforce a stockholder's liability on his original subscription that the bill "did not allege that all of the assets coming to the hands of the receivers had been exhausted or converted into cash," and dealt with insolvency as a fact to be established by proof. In *Mister v. Thomas,* 122 Md. 445, 459, 89 A. 844, 849, in construing a similar statute, it was said: "The statutory liability is declared to be an asset of the corporation for the benefit ratably of all its depositors and creditors if necessary, to pay the debts of the corporation. Manifestly there is no obligation upon the stockholder to pay anything until the amount he is required to pay has been determined by an order of a court of competent jurisdiction." The express language of the statute and these two decisions compel the conclusion that under the statute the contingency which determines whether the additional liability is enforceable is a justiciable fact to be ascertained by a court rather than summarily by some administrative official. The point, however, is of little relative importance in this case, because the order from which the appeals were taken was based upon a presumption that the assets of the corporation were not sufficient to pay its debts. It is true that by an order absolute in form, passed on March 5th, 1935, the court upon the mere affidavit of the receiver made the assessment, but leave to object to the payment of it was reserved to the stockholders, and that order, in so far as it purported to decide the existence and the extent of the liability, was superseded by the subsequent order of March 26th, from which these appeals were taken. That order, for the purpose of determining whether such an assessment may now be made, involved the alternate presumptions: (1) That the corporation's assets are insufficient to pay its creditors, but without determining the extent of the deficit; (2) that the deficit exceeds 100 per cent of the stock-

holders' liability and will continue above that level until 1938; and (3) that while it now exceeds 100 per cent, of such liability, it will fall below that level by 1938. As a result of those presumptions of fact, the objections that the assessment was made without a prior adjudication of the facts that the assets of the corporation were not sufficient to pay its debts, and the amount of the deficit, disappear unless the liability is contingent upon a completed judicial liquidation resulting in a definite and final ascertainment of the deficit. No such limitation is to be found in the express language of the statute, nor is it fairly inferable from the two cases last cited. It may be conceded that the right to enforce the liability does not depend upon the Emergency Banking Act, which deals, not with the liquidation of banks, which is this case, but with the reorganization of banks, which is not this case. But the right is created by Code, art. 11, sec. 72, and exists apart from and independently of chapter 46 and chapter 529 of the Acts of 1933 and acts supplementary thereto. The double liability statute does not speak of, nor does its application depend upon, final liquidation, but upon facts, wherever and however judicially established, that the liability is needed to pay the debts of the corporation after the exhaustion of its tangible assets. And by "exhaustion" as thus used is meant the application of all its tangible assets to the claims of its creditors. The orders from which these appeals were taken did not make any final or definite assessment upon the stockholders, but only decided that such assessment might be made if the assets of the bank prove to be insufficient to pay its debts, and, until such proof is furnished, manifestly no such assessment can be made, and if furnished only to the extent needed to meet any deficit shown by such proof.

Objections of the second group add the criticism that, since the creditors have agreed to defer the enforcement of their claims until 1938, it cannot be said that the corporation is at this time unable to pay its debts. That argument is specious rather than sound. It may reasonably be assumed that the "plan" would never have been

made, and that the creditors would never have agreed to the moratorium, had the corporation been able to pay, and had paid, its debts. It was only adopted because its assets were at the time insufficient to pay its debts, and because its debts were not paid. The only reason for the plan was that the assets of the corporation at present values were not sufficient to pay its debts. If that is assumed, and for the purposes of this case so much is conceded, at the time the plan was adopted the potential and contingent double liability of the stockholders had become an actual and presently enforceable liability, which could have been enforced at any time upon proof of those facts in court.

It is not apparent why the fact that the creditors deferred the collection of their debts either increased the assets of the corporation or decreased its indebtedness. Its assets were the same after as before the plan; its indebtedness was the same; the only effect of the moratorium was to defer the assertion of claims by creditors in the hope that more might be salvaged from the wreck in that way than by an immediate enforced liquidation. If any such benefit accrued, it could not hurt but must help the stockholders, for, as it is conceded for the purpose of this opinion that the deficit exceeded their statutory liability, whatever lessened it tended to improve their position.

Conceding that the liability is contingent, the contingency upon which it depended had occurred before the plan, and itself furnished the reason for the plan. To say that a bank which found it necessary to close its business, to abandon its building, to transfer all its assets to a collection agency, and to ask its creditors for grace, was able to pay its debts, would be to ignore the realities for a palpable fiction. Unless the bank had defaulted in the payment of its debts, there would have been no need for a moratorium.

Objections of the third group are that, as the creditors have postponed collection of their debts until 1938, they will not become due until then, no money will be needed to

pay them until then, and that until then the stockholders' additional liability cannot be enforced. That objection also ignores the realities. Acceptance of the certificates of indebtedness amounted to no more than the conversion of claims payable upon demand into claims demandable not earlier than at a time certain in the future. The debts were the same; they were not discharged; the creditors merely agreed to stay the enforcement of their right to collect them. The additional liability was for the benefit of the creditors. Their right to it was vested and could not be discharged, without their consent. *Morse on Banking*, sec. 675; note 55 *A. L. R.* 1083 (collection of cases). They have not consented to its discharge, but on the contrary, the very plan or contract, which is said to have that effect, involved the condition that the right should not be discharged. If the plan stands, the conditions preserve the right; if it falls, the right exists nevertheless, and may be enforced by the receiver, if it appears in either case that the liability is needed to pay debts which the bank cannot otherwise pay. The suggestion that it will not be needed before 1938 involves the fallacy that the debts are not payable now. The debts are payable now, and if all the tangible assets of the bank are liquidated within six months or a year, to say that the creditors must wait until 1938 to enforce a present right which they have neither waived nor released would violate not only the intent of the statute but of the Constitution. Md. Const., art. 3, sec. 39.

Finally, it is contended that the plan of having the assets liquidated by a liquidating corporation instead of by a receiver discharged the liability. That objection is more apparent than real. While technically a separate entity, the liquidating corporation is a mere creature of the Old Bank, which owns its entire stock. It holds no property which is not the property of the Old Bank, and while by the plan it is required to liquidate that property and turn the proceeds over to the Old Bank for distribution, it cannot be presumed that a court of chancery would permit it to do any act in respect to that liquida-

tion which it would not approve if done by its own receiver. All the assets of the Old Bank, including its interests equitable and legal in the property transferred to the liquidating corporation, are vested in the receiver for liquidation and distribution. The jurisdiction of the court, having attached to the general subject of liquidating the assets of the Old Bank and the distribution of the proceeds of such liquidation among its creditors, will extend to every matter and thing necessary to be dealt with to completely and finally effect that purpose (21 C. J. 134-138; *Poe v. Munich Re-Insurance Co.*, 126 Md. 520, 532, 95 A. 164 (quotes Cyc.); *Safe Deposit & Trust Co., v. Baker*, 91 Md. 297, 46 A. 1071; *Middle States Loan etc. Co. v. Hagerstown Mattress etc. Co.*, 82 Md. 506, 33 A. 886; *Keighler v. Ward*, 8 Md. 254; *Boland v. Ash*, 145 Md. 478, 125 A. 801), limited only by the condition that the relief be germane to the subject-matter, and authorized by the pleadings. *Poe v. Munich Re-Ins. Co.*, 126 Md. 520, 532, 95 A. 164. There is therefore no justification for the apprehension that the liquidation of the Old Bank's assets is beyond the control of the chancellor. It would indeed be an extraordinary thing if the officials of an insolvent corporation could transfer assets belonging to its creditors, even with their consent, to another corporation to be dealt with at their discretion, so as to put it beyond the power of a court of equity which had assumed the liquidation of the insolvent corporation to supervise the liquidation of the transferred assets. Nor can it be assumed that any such thing was intended by the plan. If the duties assumed by the liquidating corporation are discharged honestly and adequately, there is no reason why the liability of the stockholder should be affected by the fact that they are performed by an agent of the bank rather than by the bank itself or its receiver. If they are not, any abuse or error can be corrected by the court.

The underlying vice of the contention is that it assumes that the stockholders' additional liability rests upon procedure rather than upon fact. The test is whether

it is needed to pay the debts of the corporation, not how that necessity is to be established, so long as it is recognized or established in some judicial proceeding. It may appear from admissions at the beginning of a liquidating proceeding, or it may be adjudicated as a controverted issue upon proof. Its enforcement need not wait until all other available assets have been converted into cash, and that cash actually distributed and paid out, but it may be enforced whenever it is judicially established that it is needed to pay the debts of the corporation. *Morse on Banking* (6th Ed.) p. 1429. sec. 687; note 55 *A. L. R.* page 1083.

The prayer of the original bill, and the order thereon, were obviously too narrow. The only possible purpose of the bill was to effect a final liquidation of the Old Bank, but both the prayer and the order stop short of that; they merely authorize the receiver to hold the assets of the bank and to collect debts due to it. Nor were his duties or powers in that respect increased by any subsequent order. Whether the omission was inadvertent or intentional is not material, but before assessments can be made by virtue of the principles announced by the trial court in the order from which these appeals were taken, it is essential that the powers of the receiver be broadened so as to authorize him to liquidate and distribute all the assets of the bank. That is not, however, in the form the case comes to this court, ground for reversal.

The court in answer to question II (b) announced the principle that "an assessment" cannot be made if it is assumed that appreciation in the bank's assets by July 1st, 1938, will either reduce the amount of the assessment or entirely obviate its necessity. We do not agree with that conclusion. The liability becomes fixed and consummate whenever the necessity for it appears. It cannot be made to depend upon conditions which none can foresee, and which are wholly beyond the control of the court or the parties.

In reaching these conclusions we are not unmindful

of the hardships which must follow the enforcement of the liability. But if it be conceded that the statute which imposes it is economically unsound, harsh, and inequitable in its operation, and imposes onerous exactions upon wholly innocent persons, nevertheless the final answer to such considerations is that it represents the long and firmly established policy of this State, declared not only in its statutes but in its Constitution, which if changed must be changed by the people themselves and the Legislature, not by the courts.

It follows that so much of the order appealed from as answers questions I and II (a) will be affirmed, and so much of it as answers questions II (b) will be reversed, and the case remanded for further proceedings in accordance with the views expressed in this opinion.

*Order affirmed in part and reversed in part, and case remanded for further proceedings in accordance with the view expressed in this opinion; the costs in this court to be divided equally between the parties.*

### Memorandum on Motion.

A motion filed by the Baltimore Trust Corporation suggests that the effect of the aforegoing opinion is to cloud its title to the assets assigned to it by the Baltimore Trust Company and to affect their merchantability.

The opinion, considered as an entire thing, discloses no reasonable ground for the doubt.

Its effect is to decide (1) that all tangible assets of the Baltimore Trust Company were validly transferred to the Baltimore Trust Corporation, which (2) holds such assets as a fiduciary, (3) to convert them into cash in accordance with the terms and conditions of the instruments effecting the transfer, (4) which clothed the Baltimore Trust Corporation a—with title to the property transferred, and b—the power to convey, assign, or other-

wise transfer to others a good and merchantable title thereto, (5) that since the Baltimore Trust Company was entitled to receive for distribution from the Baltimore Trust Corporation the net proceeds of the liquidation of the assets transferred to it, that the court appointing the receiver acquired jurisdiction if and only if it deemed such action necessary to protect the interests represented by the receiver to direct the institution of proper proceedings to require the Baltimore Trust Corporation to adequately administer the trusts which it assumed under the instruments transferring to it the assets of the Baltimore Trust Company, and that (6) the receiver is under a duty to observe the administration of such trusts, and where circumstances indicate the necessity therefor to report to the court the result of his observation.