**BARTLETT et ux. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 4624.

Circuit Court of Appeals, Fourth Circuit.

Sept. 6, 1940.

Richard W. Kiefer and J. Kemp Bartlett, both of Baltimore, Md., for petitioners.

Howard P. Locke, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Joseph M. Jones, Sp. Assts. to Atty Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals (hereinafter called the Board), which re-

determined a deficiency in the petitioners' income tax liability for the year 1935.

The petitioners, J. Kemp Bartlett and his wife, Mary D. Bartlett, filed a joint income tax return for the year 1935 with the Collector of Internal Revenue for Baltimore, Maryland. They deducted from the gross income for 1935 the amount of $4,800, alleged to represent a loss resulting from the worthlessness of Mrs. Bartlett's 120 shares of stock of the Baltimore Trust Company (hereinafter called the Trust Co.). In his deficiency notice, the Commissioner of Internal Revenue stated that the deduction claimed was disallowed for the reason that it was determined that the stock became worthless in the year 1933. It was stipulated at the hearing that the actual cost of this stock was $2,002, and the petitioners reduced their claim for deduction accordingly. The Commissioner of Internal Revenue determined a deficiency in the amount of $1,916.97, but the Board redetermined the deficiency in the amount of $918.89. Only a part of this latter sum is involved on this appeal.

Prior to 1933, petitioner, Mary D. Bartlett, had purchased 120 shares of the capital stock of the Trust Co. In September, 1931, the Trust Co. was subjected to a heavy run by its depositors. Other banks and financial institutions and individuals in Baltimore raised a fund of $7,755,400 as a guarantee fund to be subordinated to the claims of depositors of the bank, but the guarantors were to rank as creditors ahead of the stockholders. The Trust Co. was thus enabled to continue business, and, when examined by the Federal Reserve Examiners and State Bank Examiner jointly on December 19, 1932, showed a capital bank valuation of $1,250,000 and a stockholders' equity of $482,081.63.

On February 24, 1933, the Trust Co., as well as every other state bank in Maryland, was closed by order of the Governor of Maryland, remaining closed through the national bank holiday declared on March 4, 1933, by the President of the United States. And on March 4, 1933, the State of Maryland passed the Emergency Banking Act, Laws Md.1933, c. 46, authorizing the Bank Commissioner to take custody of all banking institutions in the State. Hence, when some of the banks were allowed to reopen with the ending of the national bank holiday, on or about March 13, 1933, the Trust Co. (as well as other state banks in Maryland) found itself in the custody of the State Bank Commissioner. Under the Emergency Banking Act, the Bank Commissioner had three methods open to him concerning those banks which he did not allow to reopen on an unrestricted basis: (1) Put the bank into receivership if it was, in his opinion, in an insolvent condition; (2) place it in the hands of one or more conservators; or (3) allow it to act on a restricted basis under its own board of directors, subject to supervision. The Trust Co. was permitted (under the third of these methods) to continue on a restricted basis under its own board of directors, but subject to the Bank Commissioner's supervision. (The Trust Co. continued on this basis until January 5, 1935, when a receiver was appointed by Circuit Court No. 2 of Baltimore City.)

During the spring of 1933, the board of directors of the Trust Co. worked out a so-called plan of reorganization. The plan provided for the orderly liquidation of the assets of the bank and for the formation of a new bank, the Baltimore National Bank, to take over some of the business and privileges of the institution being liquidated. The preferred stock of the new bank was to be subscribed for by the Reconstruction Finance Corporation and the common stock was to be held in escrow with the right in the old bank to purchase the common stock of the new bank on or before July 31, 1934. Stockholders of the Trust Co. were given certain option privileges in the new bank, but only upon the basis of payment of the full purchase price of the new stock.

In explaining the plan to the stockholders, the chairman of the board, in a letter dated June 14, 1933, stated that they had been "unable to bring about a condition of liquidity in the institution sufficient to enable it to weather the period of unusual withdrawals and destruction of values during February of this year." (See Petitioners' Appendix, p. 50.) The proposed plan provided, in effect, for the following distribution out of assets:

(a) All deposits and claims not in excess of $10.00 at the date of consummation of the plan will be paid in full.

(b) 10% of all other restricted deposits and other unsecured claims as of the date of consummation of the plan, except those for which other special provision is made, will be made available to depositors and other claimants by deposits in the new bank

to the unrestricted credit of, or by direct payment to, depositors or creditors.

(c) Claims entitled to preference or priority will be paid in full as and when such preferences or priorities are established.

(d) Certificates of indebtedness will be issued to unsecured depositors and unsecured creditors for the balances of their deposits or claims remaining due after the payment made to them upon the consummation of the plan.

(e) In the case of any deposit fully secured by collateral, such deposit may be paid in full and the collateral redeemed, or the old bank may call upon a depositor holding collateral fully securing his deposit to sell the same.

(f) Liabilities which may be contingent, unliquidated or undisclosed at the consummation of the plan thereafter becoming fixed or disclosed will be placed on a parity with other unsecured claims as and when they become fixed or disclosed, out of general assets when distributable.

(g) Payments will be made to holders of Guaranty Fund Certificates after all other creditors have been paid.

(h) Any assets remaining after the retirement of Guaranty Fund Certificates will be distributed pro rata in cash or in kind among the stockholders. (See Petitioners' Appendix, pp. 64, 65.)

After the plan became effective on August 1, 1933, and the new bank was organized, the Trust Co. still remained in the hands of its officers and board of directors, under the supervision of the Bank Commissioner. The liquidating company which the plan provided might be set up did not take over the assets of the Trust Co. until December 31, 1934. At that time, a trial balance, as of the close of business on December 31st, was submitted to the Bank Commissioner. It showed assets of $36,072,615.99 and total liabilities of $27,520,899.82, which included both the deposits and the guaranty fund.

On January 5, 1935, the Bank Commissioner asked the Circuit Court No. 2 of Baltimore City to appoint his deputy, John D. Hospelhorn, as receiver of the Trust Co. The receiver was appointed for the principal purpose of collecting from the Trust Co.'s stockholders their statutory liability to creditors to the extent needed for payment in full of its remaining indebtedness. However, on February 5, 1935, the receiver filed a Report and Petition with Circuit Court No. 2 which stated in part that the remaining assets, (substantially those held for realization and liquidation by the Trust Co.), would be "grossly insufficient to pay the balance of indebtedness."

In February, 1935, Circuit Court No. 2 signed a show-cause order directing the receiver to collect the statutory liability of the stockholders. A hearing was held on the 25th of February and the order was made final. On appeal to the Court of Appeals of Maryland, the assessment order was reversed on the ground that it had not been shown that the Trust Co. had been determined, judicially or otherwise, to be insolvent. The show cause order was reversed and remanded for further proceedings in accordance with the opinion. See Robinson v. Hospelhorn, 169 Md. 117, 179 A. 515, 184 A. 903, 103 A.L.R. 740. Further hearings were then held by the lower court and on November 13, 1935, Judge O'Dunne, of Circuit Court No. 2 rendered a decision in which he found that the Trust Co. was insolvent. He authorized the receiver to proceed to collect the statutory liability of the stockholders.

The principal question to be answered is whether there was substantial evidence to uphold the Board's finding that petitioners' stock in the Trust Co., (for the purpose of deduction by the taxpayer), became worthless in 1933, and not in 1935. In answering this question, we must first look at the controlling statute and regulations:

Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A.Int.Rev.Code § 23:

"Sec. 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \*

"(e) *Losses by individuals.* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business \* \* \*."

Treasury Regulations 86, promulgated under the Revenue Act of 1934:

"Art. 23 (e)-4. *Shrinkage in value of stocks.*—A person possessing stock of a corporation can not deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or

otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under section 113 is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness."

■■ The taxpayer's claim to a deduction is a statutory privilege; the burden, accordingly, rests upon him to prove such losses as are deductible within the terms of the particular statute. Cf. Jones v. Commissioner, 9 Cir., 103 F.2d 681, 684. In securing a deduction for stock claimed to have become worthless, the claimant must show that the stock became actually worthless during the taxable year. Lambert v. Commissioner, 10 Cir., 108 F.2d 624; Olds & Whipple v. Commissioner, 2 Cir., 75 F 2d 272, 275. Section 23(e) and Treasury Regulations 86, cited supra, clearly state that such a deduction must be claimed by the taxpayer within the year that the loss has been *sustained*. No question of knowledge of the worthlessness is involved. See 3 Paul and Mertens, Law of Federal Income Taxation, § 26.67, p. 310. The Board noted in Joslyn Manufacturing & Supply Co. v. Commissioner of Int. Rev., 6 B. T. A. 749, 752, (in reversing the Commissioner of Internal Revenue): "the statute does not make the loss deduction dependent upon the time of ascertainment but rather upon the time when the loss is truly sustained." See also Squier v. Commissioner, 2 Cir., 68 F.2d 25, 27. We are thus dealing here with the time of a definite happening and a concrete result, (when the stock did first become worthless), not with any subjective standard of knowledge by the taxpayer.

■■ The harshness of this rule, however, has been softened by the requirement imposed by courts that "identifiable events" must be shown in order to establish the worthlessness. Hence, only such losses are deductible under the statute as are fixed by identifiable events. United States v. White Dental Mfg. Co., 274 U.S. 398, 401, 47 S. Ct. 598, 71 L.Ed. 1120; Brown v. Commissioner, 6 Cir., 94 F.2d 101, 103. An "identifiable event" has been defined as " * * * an incident or occurrence that points to or indicates a loss—an evidence of a loss. The evidence need not, though, consist of stereotypic plan or scope. It may vary according to circumstances and conditions." Industrial Rayon Corp. v. Commissioner, 6 Cir., 94 F.2d 383, 384. The identifiable events indicating the destruction of the value of the stock investment fix the time of the loss and, consequently, these events (by the same token) fix also the precise and only year in which the loss must be taken. As has already been stated, "the burden is on the taxpayer to establish the loss in the year in which the deduction is claimed." Lambert v. Commissioner, supra, 108 F.2d at page 625. See also Royal Packing Co. v. Commissioner, 9 Cir., 22 F.2d 536, 538.

The law applicable to deductions for worthless stock stands out in clear relief when it is viewed against the background of the law pertaining to deductions for bad debts. Section 23(k) of the Internal Revenue Code, supra, states that in computing net income a deduction shall be allowed for "Debts ascertained to be worthless and charged off within the taxable year * * *." That the term *"losses sustained"*, (applicable to worthless stock), allows less latitude in application than the term *"debts ascertained,"* (applicable to bad debts), seems apparent. The cases clearly so hold.

In speaking of deductions for bad debts, Judge Manton said in Moore v. Commissioner, 2 Cir., 101 F.2d 704, 706: "The first inquiry is whether or not the taxpayer did in fact ascertain a debt to be worthless in the year for which deduction is sought; then, whether the taxpayer acted in good faith." The real question as to deductions for bad debts thus is not when did they become worthless, but rather when did the taxpayer ascertain them to be worthless. 101 F.2d at page 707. See also Avery v. Commissioner, 5 Cir., 22 F.2d 6, 7, 8; Sabath v. Commissioner, 7 Cir., 100 F.2d 569, 571; cf. Duffin v. Lucas, 6 Cir., 55 F.2d 786, 795. Judge Sparks very neatly contrasted the two subdivisions of Section 23 of the Internal Revenue Code in Commissioner v. MacDonald Engineering Co., 7 Cir., 102 F.2d 942, 944: "It must be noted that the language of the subsection of the statute relating to the deduction for worthless debts differs from that relating to losses, in that the latter must be taken as of the year in which the losses are sustained. This has been held to be fixed by an identifiable event * * *, the point when the physical loss actually occurred, a very different matter from ascertainment that a debt has become worthless. Of course there must be some basis for the de-

termination that a debt has become worthless, and such determination may not be arbitrary and capricious." Thus, the courts insist that, as to losses from the worthlessness of stock, the time is fixed by a standard that is purely objective.

■■ The taxpayer normally has the burden of finding identifiable events to identify the particular year in which he can rightfully base a claim for deduction. In the instant proceeding, however, the taxpayers have the burden of proving that such events did not exist in 1933 and that the Board's finding to the contrary was not based upon substantial evidence. Theirs, too, is the additional burden of pointing to such events which establish that their stock first became worthless in 1935.

■ This court does not intend to substitute its judgment for that of the Board. We have recently expressed our views on the power possessed by the Circuit Court of Appeals in reviewing administrative findings. See Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624. Moreover, we have often said that the findings of the Board of Tax Appeals would not be disturbed on appeal if these findings be supported by substantial evidence. Darling v. Commissioner, 4 Cir., 49 F.2d 111, 113, certiorari denied, 283 U.S. 866, 51 S.Ct. 657, 75 L.Ed. 1470; Sacks v. Commissioner, 4 Cir., 66 F.2d 308, 309; cf. Forbes v. Commissioner, 4 Cir., 62 F.2d 571, 575. The Supreme Court has clearly stated its views on this subject through Mr. Justice Brandeis in Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L. Ed. 1343: "The Court of Appeals is without power, on review of proceedings of the Board of Tax Appeals, to make any findings of fact. 'The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided.' Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 725, 49 S.Ct. 499, 502, 73 L.Ed. 918. The function of the court is to decide whether the correct rule of law was applied to the facts found; and whether there was substantial evidence before the Board to support the findings made. [Citations.] Unless the finding of the Board involves a mixed question of law and fact, the court may not properly substitute its judgment for that of the Board."

■■ A consideration of all the evidence satisfies us that the finding of the Board in the instant case is supported by substantial evidence. Inasmuch as the Commissioner's finding is presumptively correct, the petitioners, in appealing to the Board, had the burden of showing that the finding that their loss was sustained in 1933 and not in 1935 was not so supported. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. The Board found that the petitioners did not meet this burden of proof. We hold that there is substantial evidence to support this finding by the Board.

The Trust Co. was closed in February, 1933, pursuant to a state bank holiday, by order of the Governor. At that time, the deposits had shrunk from approximately $85,000,000 in July, 1931, to about $37,000,000. In March, 1933, the institution was allowed to reopen, but only on a restricted basis and only under the continued supervision of the Bank Commissioner of Maryland. It never resumed normal operations. The Bank Commissioner testified that the bank (the Trust Co.) was allowed to do certain things, such as renew notes, but that it was not open for general business, and that he did not know whether it would have been allowed to accept deposits. After operating the bank under these restrictions, the directors of the Trust Co. worked out a plan of "reorganization" in 1933. The plan, approved as of August 1, 1933, provided for the orderly liquidation of the assets of the Trust Co., and for the formation of a new bank to take over some of the business and privileges of the institution which was being liquidated. Certain option privileges in the new bank were given to old stockholders, but only upon the basis of payment by them of the full purchase price of the new stock. The plan made provisions for distributions out of assets to parties assenting to the plan: the common stockholders, considered in the closing paragraphs of the distribution arrangement, were to receive a pro rata distribution of any assets remaining after the retirement of the Guaranty Fund Certificates which totalled $7,755,400.

If this evidence be viewed from a practical standpoint, it would appear very questionable then whether the common stockholders would have any equity whatever in the assets of the Trust Co., and whether there would be any assets remaining after the retirement of the Guaranty Fund Cer-

tificates and other prior claims. Indeed, there was grave doubt whether even depositors would recover a substantial portion of their deposits. The petitioners were put on guard by these successive events as to the possible worthlessness of their stock. The very fact that the plan of liquidation made no provision for new stock to be given to the common stockholders in place of their old seems to indicate that in the eyes of those who engineered the plan, the common stock was at that time worthless.

 True it is that a taxpayer need not be an "incorrigible" pessimist in estimating the net worth of his securities. Cf. United States v. White Dental Co., supra, 274 U.S. at page 403, 47 S.Ct. 598, 71 L.Ed. 1120. Nevertheless, under the specific wording of Section 23(e) and Article 23(e)-4 of Treasury Regulations 86, cited supra, he owes the duty to scrutinize his holdings carefully at the first out-cropping of identifiable events suggestive of their worthlessness. Such a close examination in 1933 might very well have revealed the facts found by the Commissioner and the Board. On the evidence submitted, we cannot well hold otherwise.

In In re Hoffman, D.C.E.D.Pa., 16 F. Supp. 391, affirmed, 3 Cir., 87 F.2d 200, the plaintiff was claiming a deduction for stock held in the Franklin Trust Company, which, it was alleged, had become worthless in 1933. The Board held that it became worthless in 1931. In 1931, on an order of the State Banking Department, the Franklin Trust Company closed its doors—not because of insolvency but because it was deemed unsafe to permit it to continue business. Inventory and appraisement of the bank's assets, which were filed on June 20, 1932, showed book values of $38,828,-146.43, with liabilities of $16,118,514.36. The bank had paid a dividend to its stockholders on October 1, 1931, shortly before it was closed. In affirming the finding of the Board, the court stated (16 F.Supp. at page 392): "To say that stockholders of a bank which has been closed by order of the authorities and ordered liquidated do not sustain a loss upon their stock until some subsequent date when liquidation finally takes place, or until the official appraisement of the bank's assets, seems to me to be losing touch with reality. It is just conceivable that cases might arise in which some realization could be had by the stockholders in the long future. *As a practical matter, however, the business world never remotely considers that contingency. To all intents and purposes the stock of a bank becomes unsalable at any price when the bank is taken over and liquidation begins.*" (Italics supplied.)

In Brooks v. United States, D.C.M.D.Pa., 32 F.Supp. 158, the plaintiff brought an action to recover an alleged overpayment of income taxes for the tax year 1933. He had owned stock in the First National Bank of Carbondale, Pennsylvania. During March, 1933, the bank had been closed during the bank holiday, by the proclamation of the President of the United States. Robert Jadwin, the president of the bank, had then been appointed conservator and the bank was operated on a restricted basis under Jadwin as conservator until August 4, 1933, when the bank began operating on an unrestricted scale. Under a plan of reorganization, approved by the Comptroller of the Treasury Department on May 20, 1933, the old stockholders were to make a contribution which was the amount they would have been liable for in the event the bank were to liquidate. It was later provided that the old stockholders were to have the option of purchasing shares of stock in the new bank at $10. per share,— the same price at which it was subsequently to become available to the public. The district court reversed the Board's finding that the stock had not been proved worthless in 1933. In reaching its conclusions, the court emphasized the facts surrounding the issue and sale of the new common capital stock (32 F.Supp. at page 164): "That sale of new stock was made on equal terms to new and old stockholders. In other words, at the time of cancelation of the old common capital stock and the issuance of new, there was no longer any hope of recovery on the old common stock. That old common stock conferred no benefit or valuable privilege with respect to the reorganization of the bank, since the new common stock was offered to old shareholders on the same basis it was offered to outsiders, and the retention of the old shares would give no interest in the reorganized corporation. At that time it was then certain that the old common stock of the First National Bank of Carbondale was wholly and permanently worthless, had become so in 1933, and therefore the plaintiff was entitled to take a deduction for loss in that year in computing his net income subject to tax."

In Foster v. Commissioner, 1 Cir., 112 F. 2d 109, the court upheld the Board's finding that stock in the Exchange National Bank had become worthless in 1933 and not, as contended by the petitioner, in 1934. The Exchange National Bank had been closed in 1933, first on account of a bank holiday declared by the State of Oklahoma, and then on account of the national bank holiday. On March 14, 1933, the bank reopened, without any limitation on its activities, and continued to do business through the 24th. of April, 1933. It went through a form of reorganization and on April 25, 1933, the new bank, the National Bank of Tulsa, began business. The individual stockholders of the Exchange National Bank received nothing as a result of the transfer of the assets to the National Bank of Tulsa, but, based on book value, these stockholders did have on April 24, 1933, an equity of $2,687,805.39. Nevertheless, the court held that there was substantial evidence to support the Board's finding that the petitioner had not proved that the stock was worthless in 1934, and that there was substantial evidence to support the finding that the stock had become worthless in 1933.

██ It often has been observed that "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." Lucas v. American Code Co., 280 U. S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538, 67 A.L.R. 1010. Hence, the determination of the year in which a stock became worthless is ultimately a question of fact, each case standing on the combination of circumstances peculiar to it. See Morton v. Commissioner, 7 Cir., 112 F.2d 320, 321; cf. Rhodes v. Commissioner, 6 Cir., 100 F.2d 966, 969. We, therefore, find it unnecessary to consider with more than a citation the many cases which we have analyzed in formulating our opinion. E.g., Morton v. Commissioner, supra; Lambert v. Commissioner, supra; Brown v. Commissioner, supra; Olds & Whipple v. Commissioner, supra; Benjamin v. Commissioner, 2 Cir., 70 F.2d 719; Gowen v. Commissioner, 6 Cir., 65 F.2d 923; Jeffery v.

Commissioner, 6 Cir., 62 F.2d 661; Forbes v. Commissioner, supra; DeLoss v. Commissioner, 2 Cir., 28 F.2d 803.

The petitioners placed great reliance upon Sherill v. Adkins, D.C.E.D.Ark., decided September 2, 1939, 4 C.C.H., p. 9408.[1] We feel that this decision largely rests upon the peculiar terms of the Arkansas statute which allowed the Bank Commissioner to assume management of a bank where there was merely an impairment of capital of the bank, though there was no insolvency. The evidence in that case showed that an appraisal which disclosed solvency had been made in 1933. In the instant case, there is no evidence of either any appraised or actual value of the stock during 1933. (There had been valuation reports in December, 1932, several months before the bank holiday, and also in December, 1934.) Cf. Smith v. United States, D.C., 16 F. Supp. 393.

We were impressed by the testimony of John J. Ghinger, a former vice-president of the Trust Co., who had held the position of Bank Commissioner of Maryland from February 22, 1933, until September, 1935. He testified that in his opinion the stock became worthless in 1935. However, there is evidence to the contrary upon which the Board could, and doubtless did, base its finding. Cf. Foster v. Commissioner, supra, 112 F.2d at page 113; Brown v. Commissioner, supra, 94 F.2d at pages 103, 104.

Although, on an independent consideration of the facts involved in this case, we might reach a conclusion different from that reached by the Board, we feel that there is here relevant evidence in such quantity and quality that a reasonable mind might well accept this evidence as adequate to support the conclusion of the Board. Cf. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126. We cannot say there is not substantial evidence to support the Board's finding that the stock of the Baltimore Trust Company became worthless in 1933. We, therefore, affirm the action of the Board.

Affirmed.

---

[1] No opinion for publication.