## In re ST. PAUL GARAGE CO.
### No. 8451.

District Court, D. Maryland.
June 1, 1937.

Watson E. Sherwood, of Baltimore, Md., for trustee.

G. Ridgely Sappington, of Baltimore, Md., for Baltimore Trust Corporation.

CHESNUT, District Judge.

In the administration of the estate of the St. Paul Garage Company in bankruptcy, the Baltimore Trust *Corporation* (a liquidating agent for the Baltimore Trust *Company*) filed and proved three claims amounting to $282,708. The Trustee in bankruptcy filed a petition asking that all of these claims be disallowed unless certain alleged preferences were returned by the claimant to the bankrupt estate. In the ensuing controversy the issue, however, narrowed down to the question as to whether certain accounts receivable assigned by the bankrupt to the claimant, in the face amount of $9,675.43 as collateral for a newly made advance of $10,800 made as a loan, was voidable under section 60b, Bankr.Act, 11 U.S.C.A. § 96(b), as a preference or as a conveyance with intent to hinder, delay or defraud creditors under section 67e of the Bankruptcy Act, 11 U.S. C.A. § 107(e). On these issues the Referee took testimony, heard argument and found as to both against the Trustee in bankruptcy, and thereupon passed an order filed March 12, 1936, which he seeks to review in the present proceeding. In connection therewith the Referee has filed his certificate on March 12, 1937, stating how the question arose and was decided and also separately under date of February 25, 1937, the Referee filed an extended report entitled "Referee's Findings of Fact and Conclusions of Law" in which he summarized the testimony given before him in the controversy and stated his conclusions therefrom. But the testimony itself taken by the Referee has not been written up nor filed and is not before me. It results that the matter now presented for decision must be decided on the basis of the findings and conclusions of the Referee and the summary of testimony included in his findings. The matter has been quite fully argued by counsel for the respective parties.

As the Referee's report includes a very full discussion both of the substance of the testimony and of the applicable law, it is unnecessary to repeat here what is therein contained. And I will limit the discussion to what is necessary in explanation of the conclusions which I have reached.

The financial history of the St. Paul Garage Company, situated at the northwest corner of St. Paul and Saratoga Streets in Baltimore City, is reviewed in some detail by the Referee. The ultimate question as to whether the transfer of the accounts receivable to the Baltimore Trust Corporation on October 1, 1935, constituted a voidable preference must be determined by the conclusion as to whether or not at that time the Baltimore Trust Corporation had *"reasonable cause to believe"* that the St. Paul Garage Company was then insolvent in the sense that its assets were not sufficient to satisfy its liabilities *at their then fair valuation.* The law may be stated thus shortly, so far as this case is concerned, and in view of the fuller statement in the Referee's report. See, also, Gilbert's Collier on Bankruptcy, 4th Ed., § 1183; In re Bresnan, 45 F.2d 193, 196. (D.C.Md.). The Referee concluded that the St. Paul Garage was in fact then insolvent in this statutory bankruptcy sense. The bankruptcy petition in fact was filed on January 16, 1936, and the adjudication occurred on February 1, 1936, both within four months after October 1, 1935. On the summary of the financial data and testimony as to value of assets set out by the Referee it is quite clear that his finding of insolvency was justified, and indeed this finding has not now been challenged by the claimant's attorney. The only question, therefore, is whether the claimant through its officers had reasonable cause on October 1, 1935, to believe that the St. Paul Garage was insolvent. As to this the Referee very clearly posed the question as follows:

"The claimant through Thomas, its president, knew whatever the bankrupt or any of its officers knew of its financial condition. Did this knowledge amount to 'reasonable cause to believe' that the transfer would effect a preference? More specifically, was there reasonable cause to believe that insolvency existed and that the transfer would have the effect of giv-.

ing the claimant more than its share of the assets. Here, as in the case of insolvency, the principles adopted by the courts are easy to state and hard to apply. The rule most commonly stated is that in preference cases, notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would have disclosed. In the matter of Bresnan, 45 F.2d 193."

The Referee concluded that the question should be answered in the negative, saying, at the end of that portion of his report entitled "Findings of Fact" as follows:

"I am not justified in concluding from the testimony that the transfer of the new accounts receivable to the claimant on October 1, 1935 as security for the loan of $10,800 was made or received in contemplation of bankruptcy or for the purpose of hindering, delaying or defrauding creditors, or (specifically) that the claimant accepted the said transfer with knowledge or reasonable cause to believe that the Garage Company was insolvent in the bankruptcy sense, or that the mortgagees were about to foreclose, or that claimant's motive in making the loan and receiving the security was to benefit itself or the bank at the expense of other creditors."

█ Counsel for the claimant refers to this quotation from the Referee's report as itself constituting a finding of fact which must be accepted as conclusive, in the absence of a stenographic report of the testimony before the Referee. See Putney Shoe Co. v. Dashiell, 4 Cir., 246 F. 121; Kaufman v. Tredway, 195 U.S. 271, 25 S. Ct. 33, 49 L.Ed. 190; Whitmore v. Swank, 4 Cir., 252 F. 135; Gilbert's Collier on Bankruptcy, 4th Ed., § 1192. But I think this general principle inapplicable here because the testimony as summarized by the Referee was not conflicting (indeed there was little testimony offered by the claimant) and thereafter under the heading of "Conclusions of Law" the Referee proceeds at length to consider the relevant statutory provisions in the bankruptcy law and their application as made by the courts in particular cases. That is, the Referee's conclusion seems to have been based on the legal effect of the whole evidence rather than on the weight of conflicting evidence. And with respect to the question as to whether the claimant had reasonable cause to believe that there was insolvency,

the reason given by the Referee in his conclusions of law is stated as follows:

"If, however, the claimant knew or should have known that an appraisal of the real estate would show the insolvency of the Company, it must have known that it was receiving a preference. The testimony does not, however, support the conclusion that the claimant either had or should have had such knowledge. As previously stated, appraisals of property of this character are based largely on the judgment of the individual appraiser. Evidence of value is at least largely a matter of opinion. (Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216, 57 S.Ct. 423, 81 L.Ed. 612, 108 A.L.R. 436, decided by the United States Supreme Court February 15, 1937). Different appraisers therefore might arrive at widely different valuation of the property. It is true that according to Magee's appraisal the bankrupt was insolvent; but the testimony fails to show that equally honest and competent appraisers may not have set a value on the real estate which would have shown the bankrupt to be solvent. It does not appear that an appraisal was made at that time, and to require the claimant to know in advance a subsequent appraisal to show insolvency would be manifestly unreasonable. I therefore conclude that when the claimant received the assignment of additional accounts on October 1, 1935 he did not have reasonable cause to believe the bankrupt was insolvent. The assignment, therefore, did not constitute a voidable preference."

█ The significance of the value of the property of the Garage Company as bearing on the question of insolvency will appear from the Referee's summary of the testimony which is too lengthy to be here repeated. The point here to be noted particularly is that the Referee concludes that the claimant did not have reasonable cause to believe there was insolvency because the then book value of the property, as entered on the books of the corporation, at the formation of the corporation, and thereafter carried at about the same figures, showed a substantial margin over all liabilities. The basis for the Referee's conclusion therefore is in substance that as the property had not been re-appraised between 1929, the year of the formation of the corporation, and October 1, 1935, the president of the claimant who was also a director of the bankrupt, did not have

reasonable cause to believe there was insolvency.

But, while the Referee's report presents an extended and careful consideration of the effect of the evidence, I am unable to escape the conclusion after reading his summary of the testimony, that too much weight has been given to the particular consideration. It elsewhere appears from the report that the situation which must have been known to Mr. Thomas as president of the claimant and director of the bankrupt, was substantially as follows:

1. The several properties at the northwest corner of St. Paul and Saratoga Streets were acquired for the Garage Company at a total cost of $678,500. The lots were improved by then present buildings which must have been of substantial value and which were demolished preliminarily to the construction of the new garage building. The latter was constructed at a cost of about $850,000 in 1929 to 1930. At the organization of the corporation a real estate expert, Mr. Wm. E. Ferguson of Baltimore, is reported to have appraised the land and new garage building when completed at an aggregate value of $2,000,000, in consequence of which the Garage Company then fixed the book value of the land alone at $1,150,000, and this despite the fact that the properties had theretofore been acquired at the price of only $678,500, and the substantial improvements thereon demolished. What was done, therefore, on organization was a book *write-up* of the value of the land to the extent of approximately $500,000 and this based merely upon the appraisal of a real estate expert as to the combined total value of land with new garage building before the latter had been constructed and in advance of knowing how commercially successful it would be.

2. From 1930 when the garage was first opened for business, until October 31, 1935, the garage had never been commercially successful. It had borrowed $800,000 on a first mortgage at 6%, and $200,000 on a second mortgage at 6%. Its fixed interest expense on these two mortgages was approximately $60,000 a year. But its average net yearly income from operations (before interest and depreciation) for the five-year period had been only about $22,000, the highest amount being $34,647.57 in 1932, and the lowest $15,927.50 in 1933. Its aggregate net losses from operations over the five-year period approximated $180,000. During the first year of its operations it declared and presumably paid dividends on its preferred stock from a surplus fund which had been set up but had never actually earned these dividends and never declared or paid any dividend on the common stock.

3. The Garage Company had been promoted and financed originally by the Baltimore-Gillet Company (which owned 21% of the preferred stock and 84% of the common stock of the bankrupt and also held notes of the bankrupt for $243,500). The Baltimore Trust Company became the owner of all the common stock of the Baltimore-Gillet Company and had made additional small loans to the Garage Company.

4. On May 4, 1934, the Garage Company being unable to pay the taxes on the property and the interest on the first and second mortgages, the Baltimore Trust Company and the two mortgagees and the Garage Company entered into a written agreement by which in effect the interest on the second mortgage was postponed until October 1, 1935, and the interest on the first mortgage was reduced to the absolute requirement of three per cent. instead of six per cent. until the same date, and the Baltimore Trust Company guaranteed the payment of taxes and three per cent. interest on the first mortgage until October 1, 1935. The principal of both the first and second mortgages matured on the latter date.

5. On July 1, 1935, the Garage Company was unable to pay the taxes on its property and obtained money for that purpose by borrowing $10,000 from the Baltimore Trust *Corporation*. Security of accounts receivable was taken for this loan. The immediate situation on September 30, 1935, was stated by the Referee to be as follows:

"On that date, September 30, 1935, the corporation was confronted with a desperate situation. On that date the agreement of May 4, 1934 above referred to expired. On the following day the principal of the first and second mortgages above mentioned became due and payable, interest became due on the first mortgage for the period of April 1 to September 30, 1934, in the amount of $10,800 (this being the reduced amount fixed by the agreement of May 4, 1934) and deferred interest of $21,000 became due to the Mercantile Trust Company as provided in that agreement. The bankrupt, therefore, owed on October

1, 1935, to the mortgagees alone the principal amount of $920,000 plus interest of $51,800. It also owed about $280,000 on other notes then due and payable."

6. The current assets of the Garage Company were much less than its current liabilities. It had only $9,675.43 of unpledged accounts receivable, an inventory of $3,466.26, unmortgaged equipment valued at $13,795.24, with prepaid insurance, taxes, etc., in the amount of $5,105.01. Its liabilities at that time all then due and payable aggregated $1,228,190.72. Of this amount $920,000 represented the balance due on the first and second mortgages. The accrued interest and taxes amounted to $38,439.64, accounts payable to $15,520.-61, ·in addition to which there were notes payable in the amount of $253,629.97.

7. It appears also that on or about September 30, 1935, the Baltimore Trust Corporation notified the first mortgagee that it would not thereafter advance funds to the Garage Company or be responsible in any way for its debts subsequently incurred.

 In view of this financial situation which, in the Referee's· report, is correctly described as "desperate," it does not seem sound to hold that the Baltimore Trust Corporation had no reasonable cause to believe the Garage Company was insolvent, merely because the book value of its land and building was still carried at a figure representing an appraisal by a real estate expert made five years previously, and before the garage building had been constructed, and before there was any experience as to whether it would be a commercial success or failure. Indeed the circumstances under which the book valuation was adopted would seem to indicate that as a financial matter it should have been considered as of little importance by·those dealing with the property. But there were other reasons apparent from the report or implicit in the whole matter which seem to clearly indicate that Mr. Thomas, as an experienced Baltimore banker, must have known that the. book valuation for land and building was not to be seriously relied upon. For instance, at the· request of the corporation the assessment for taxes on the property had been reduced for land and building to $569,650 as compared with the book valuation of $1,741,748.32. While tax assessments are very frequently and in many jurisdictions well known to be less than fair market value, nevertheless it is generally well known that under the Maryland taxing statutes it is required that assessments shall be at full value and in Baltimore City it is commonly understood that for some years past real estate assessments as a rule have been at least approximately at full value. Furthermore the trend of prices for real estate in Baltimore City and elsewhere during the years of economic depression, say from 1929 to 1935, was well known. That is to say, it was a matter of common knowledge that the fair value · at least in the sense of marketability of practically all real estate was very much less in 1935 than it had been in 1929.

But there is, I think, an even more important consideration. It is obvious that the Garage Company was highly insolvent in the ordinary commercial sense and on the testimony the Referee has found, without serious challenge, that it was also insolvent on October 1, 1935, in the bankruptcy sense. In the testimony summarized by the Referee there is little to be found to indicate that facts known at the time of taking the testimony as bearing on the value of the property, were new as compared with what must have been known on October 1, 1935. It is true that the decision of the mortgagee to foreclose was made after October 1, 1935, and as indicated by the Referee seems to have come as a' surprise to the directors of the Garage Company who probably still in good faith continued to expect or at least hope that some extension or modification of the mortgages could be voluntarily obtained. Nevertheless the Baltimore Trust Corporation had withdrawn any further financial support and it must have been evident at that time that unless the mortgagees could be induced to make substantial concessions for the future, foreclosure would inevitably result by either the first or second mortgagee. While, of course, the price realized at a mortgage foreclosure sale, as is correctly pointed out by the Referee, is not always or perhaps often a real test of fair value, nevertheless, all the circumstances considered, it seems quite unlikely that any one knowing the situation affecting the Garage Company could reasonably have believed that on October 1, 1935, a purchaser could have been procured for the property at a figure in excess of its liabilities in the amount of $1,228,190.72. With the exception of the land and building constituting the garage property, its other assets were comparatively negligible, being valued at only $40,743.80. It seems high-

ly improbable that the Baltimore Trust Corporation at that time in view of the existing conditions could have seriously thought that the fair value of the garage property, land and building, was worth then presently or in the near future, anything like so much as a million dollars. As a practical matter one undertaking to determine the fair value of this property would not base the valuation on the land and building separately but on the property as an entity. And as an entity, it should, of course, have been valued for its highest utility which was that of a garage property. And for this purpose it had had a five-year period of inability to earn net, even before depreciation, more. than an average of about $22,000 a year which is only about 5% return on a total valuation of $400,000. Even if it can be assumed that there was some reasonable prospect of improvement in earning capacity in the near future, it is difficult to believe that it would have been possible to sell the property for any sum approximating a million dollars at that time; nor was there any evidence to indicate that the prospective net income from management of the property would yield substantially larger net income than the five-year test period. And it seems to have been the view of Mr. Mackall, the president of the Garage Company, and apparently the only witness called on behalf of the claimant, that the proper basis for ascertaining the fair value of the garage property was to capitalize its net earnings. According to his figures the net income (before depreciation) for the year ending December 30, 1934, was $22,791.96, which even if capitalized at the rate of 3%, an extremely low figure for an enterprise of this kind, would indicate a valuation of only $759,732. At the foreclosure sale under the second mortgage on December 9, 1935, the land and building were sold for $10,000 subject to a first mortgage of $720,-000.

It is also to be noted that the claimant did not submit any affirmative testimony in support of its contention that the financial situation of the Garage Company did not furnish to the claimant reasonable cause for belief in insolvency, with the exception of the testimony of Mr. Mackall which has already been referred to. Specifically, Mr. Thomas, the president of the claimant, and a director of the Garage Company, was not called as a witness, counsel for the claimant stating that he was not available at the time the testimony was taken, as he was in Florida. In the absence of any affirmative testimony (other than that of Mr. Mackall) in support of the claimant's contention on this issue, I am forced to the conclusion that from the facts stated in the Referee's summary of the evidence it must be found that the claimant did have reasonable cause to believe that the Garage Company was insolvent in the bankruptcy sense on October 1, 1935.

The applicable statute does not require, as a condition for voiding a preference, that the creditor receiving it should in fact actually believe in the insolvency of the bankrupt at the time, but only requires that he must have reasonable cause for that belief. Gilbert's Collier on Bankruptcy, 4th Ed., § 1186.

As to the remaining conclusions of the Referee, I am in agreement with him. Thus, his conclusion that the transfer was not made for the purpose of hindering, delaying or defrauding creditors seems in accord with the testimony reviewed. Nor does the testimony establish that the claimant *knew* or believed that the mortgagees were about to foreclose, nor is there any warrant for the inference that the claimant's dominant motive in making the loan and receiving the security was to benefit itself or the Baltimore Trust Company at the expense of other creditors, as the claimant itself was so largely an unsecured creditor. On the contrary the testimony as summarized is consistent with the view that the dominant motive in the transaction, both on the part of the Garage Company and the claimant, was, in the interest of all concerned, if possible, to keep the enterprise a going one with the *hope* that better financial conditions would prevail in the future.

The case presents the somewhat unusual feature that the preference given and to be avoided was received only coincident with the further advance by the claimant of additional moneys, $10,800, which were in excess of the value of the property transferred by the bankrupt. Ordinarily, of course, such an advance made in good faith and without knowledge on the part of the creditor receiving the security that a preference was intended for some one else, would be protected. But the Referee found this principle was not applicable to the present case because the

claimant in advancing the money knew that it was to be applied in payment of interest to the first mortgagee due September 30, 1935, which had been guaranteed by the Baltimore Trust *Company* under the agreement of May 4, 1934, above referred to. While not necessary to his decision the Referee briefly considered the applicable law and held that as the Baltimore Trust *Company* was the guarantor of the mortgage interest paid from the fresh advance, the Baltimore Trust *Corporation*, which made the advance, stood in such relation to the Baltimore Trust Company that it must also in substance be treated as the guarantor of the bankrupt's obligation to the first mortgagee. It seems to have been uniformly held by the bankruptcy decisions that a creditor who is a guarantor for the bankrupt may not retain a security given for a loan to the bankrupt to enable him to discharge his guaranteed obligation. National Bank of Newport v. National Herkimer County Nat. Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042; Walker v. Wilkinson, 5 Cir., 3 F.2d 867, 871; Charlesworth v. Levy Meat Co., 8 Cir., 73 F.2d 953, 969; Lincoln Theatres Corp. v. Fleming, 4 Cir., 66 F.2d 441; Paper et al. v. Stern, 8 Cir., 198 F. 642; 88 A.L.R. 83.

Counsel for the claimant in this case strenuously contests the applicability of such decisions to the situation of the Baltimore Trust *Corporation*. He points out that it is legally a separate corporation from the Baltimore Trust *Company,* and that as liquidating agent for the latter, it took over its assets but did not assume its liabilities and therefore the Baltimore Trust Corporation was not itself a guarantor of the mortgage interest and was under no obligation to advance money to pay the same and could not have been successfully sued therefor by the first mortgagee; in short, was not a creditor of the Garage Company by reason of the agreement of guaranty of May 4, 1935. The position thus stated seems plausible at first blush but requires further consideration as to the real relationship of the *Corporation* to the Company. The Baltimore Trust Company suspended ordinary banking operations in February 1933 when there was a general temporary closing of the banks. Thereafter it was not permitted by the State Bank Examiner to re-open for business. In 1933 the Maryland Legislature passed the Emergency Banking Act, chapters 46, 486, and under the authority thereof the Bank Examiner, before appointment of a receiver for the Baltimore Trust Company by a Maryland State Court of Equity, approved the "plan of reorganization" for the Trust Company, one of the features of which was the liquidation of its assets by the separately formed Baltimore Trust Corporation as Liquidating Agent for the assets. The plan of reorganization referred to has not been made a part of the testimony in this case but its general nature is indicated in a recent case in the Court of Appeals of Maryland. Robinson v. Hospelhorn, 169 Md. 117, 179 A. 515, 184 A. 903, 103 A.L.R. 740. At page 137 of 169 Md., 179 A. 515, 524, 184 A. 903, 103 A.L.R. 740, Judge Offutt, for the Court of Appeals, had this to say with regard to the status of the Baltimore Trust Corporation:

"Finally, it is contended that the plan of having the assets liquidated by a liquidating corporation instead of by a receiver discharged the [stockholders'] liability. That objection is more apparent than real. While technically a separate entity, the liquidating corporation is a mere creature of the Old Bank [Baltimore Trust Company] which owns its entire stock. It holds no property which is not the property of the Old Bank, and while by the plan it is required to liquidate that property and turn the proceeds over to the Old Bank for distribution, it cannot be presumed that a court of chancery would permit it to do any act in respect to that liquidation which it would not approve if done by its own receiver. All the assets of the Old Bank, including its interests equitable and legal in the property transferred to the liquidating corporation, are vested in the receiver for liquidation and distribution. The jurisdiction of the court having attached to the general subject of liquidating the assets of the Old Bank and the distribution of the proceeds of such liquidation among its creditors will extend to every matter and thing necessary to be dealt with to completely and finally effect that purpose, * * * limited only by the condition that the relief be germane to the subject-matter, and authorized by the pleadings."

It seems evident that the principal purpose of the formation of the corporation was to hold title to, conserve, salvage and finally realize upon the assets of the Trust Company without immediate forced sale at sacrifice prices and thus to take advantage

of what was expected to be, and it is said has proven to be, substantially increased value in many cases for the assets.

The Baltimore Trust Corporation thus received for holding and liquidating the Garage Company's notes in the amount of approximately $250,000, and also a majority of the common stock of the Garage Company, and thus became for all practical purposes the substantial owner of the Garage Company, subject to its indebtedness. It was evidently this large interest in the property which motivated the Baltimore Trust Company in giving its guarantee in the agreement of May 4, 1934. The dominant consideration which then actuated the Trust Company apparently was to keep the Garage Company a going concern in the hope of future financial improvement. The Baltimore Trust Corporation was formed thereafter in December 1934, and in the substantial financial sense succeeded to the situation which previously existed. That is to say, the policy of the Company had been, and of the Corporation continued to be, to keep the Garage Company a going concern. For this purpose the Corporation as a part of its conservation and salvaging policy, doubtless made the advances to pay the first mortgage interest which was due April 1, 1935, and continued the same policy with respect to the interest due October 1, 1935, although it then announced that it would not continue that policy for the future.

In this situation the distinction between the Corporation and the Company seems only technical and not substantial for the purposes of this case. The obligation of the guaranty of May 4, 1934, was clearly enforceable against the Trust Company legally, and would have been chargeable against the assets held by the Corporation. Whether the mortgagee could have recovered the claim in full as a creditor preferred over general creditors of the Trust Company who became such before the "banking holiday" in 1933, 12 U.S.C.A. § 95 note, does not certainly appear in the case; but it is to be noted that the guaranty was given more than a year later when the Company was under the supervision of the Bank Examiner under the Emergency Banking Act of 1933, and it had the express written approval of the Bank Examiner. It seems a fair inference that it was given to conserve the large interest of the Trust Company in the Garage enterprise for the benefit of the old creditors of the Trust Company, and its obligation if not otherwise discharged would have had to be met from the assets held by the Corporation, in preference to old creditors.

█ The effect of the transfer of October 1, 1935, was to take free assets of about $9,000 from the Garage Company and dedicate them at the expense of unsecured creditors, including about $15,000 of general merchandise creditors, to the payment of mortgage interest to the mortgage creditor to the exoneration of the guarantor. This clearly diminished the bankrupt estate which would otherwise have been available to unsecured creditors, and benefited the Baltimore Trust Company as guarantor, and relieved the assets held by the Baltimore Trust Corporation. The conclusion seems to be clearly required that the Corporation in this transaction must be treated as acting not as an independent entity, but as an agent for the Trust Company. Johnstone v. Babb, 4 Cir., 240 F. 668.

It should be added that the Referee did not consider or pass upon the contention, apparently made at one time in the pleadings by the Trustee in Bankruptcy, that the claims of the Baltimore Trust Corporation should legally be subordinated to that of trade creditors, and of course nothing herein said is intended in any way to relate to such a contention if it exists in the case.

The final conclusion necessarily is that the order of the Referee appealed from must be reversed and an order passed requiring the claimant to surrender any right or interest in the pledged accounts assigned to it as a condition for the allowance of its claims. The practical difference in dollars and cents as a result of this holding would seem not to be very great. The Referee states the dividend to unsecured creditors will not be more than 1% and as an unsecured creditor the Baltimore Trust Company will be entitled to its proportion of any distribution which apparently will be more than nine-tenths of any net sum therefor.

Counsel may present the order appropriate to the conclusion reached.